# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00774-COA

KELLEN J. HILLS                                                    APPELLANT

v.

ABIGAIL S. MANNS (HILLS)                                          APPELLEE

DATE OF JUDGMENT:              01/05/2022
TRIAL JUDGE:                   HON. MITCHELL M. LUNDY JR.
COURT FROM WHICH APPEALED:     DESOTO COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:       T. SWAYZE ALFORD
                               KAYLA FOWLER WARE
ATTORNEY FOR APPELLEE:         VANESSA WINKLER PRICE
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED - 12/12/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A father appeals the modification of a visitation schedule. He argues the trial court erred by not dismissing the mother's petition on the basis of res judicata, not awarding him attorney's fees, and awarding her the final decision-making authority.

¶2.     We affirm the trial court's finding that the visitation schedule was not working and needed further specificity. We likewise affirm that res judicata did not apply, as there were new circumstances giving rise to the mother's claim for a change in the visitation schedule, and the trial court did not abuse its discretion by awarding the mother authority to make final decisions for the children. And because he did not prevail, the father was not entitled to attorney's fees.

# BACKGROUND

¶3.   Kellen and Abigail Hills had two children during the course of their marriage: a girl in 2012 and a boy in 2014.  They decided to divorce in 2018 and agreed on a "Property Settlement Agreement."  The PSA granted both parties joint legal custody, with Abigail having sole physical custody and Kellen having alternating weekend visitation.  The PSA further set out a visitation schedule for holidays, special days, and vacation days from school.  The trial court incorporated the PSA into a final judgment of divorce.

¶4.   But the PSA did not specify what time Kellen would return the children the Monday following his weekend.  It only stated that "the Father shall have periods of visitation with the minor children on alternating weekends of each and every month from Thursday through Monday morning."  The PSA also did not define what days would be considered a "holiday."

¶5.   And not long after their divorce, this lack of specificity led to conflict between the parents.  There were other problems.  Kellen sought to hold Abigail in contempt for making decisions regarding the children's school, daycare, and extracurricular activities without his approval.  Abigail filed her own motion for contempt alleging Kellen was causing problems with the visitation schedule.  The trial court denied Abigail's request to modify the visitation schedule and ended up finding both parents in contempt for not following the language of the order.

¶6.   Kellen filed a motion for reconsideration, which led to the trial court modifying its original ruling.  The chancellor ordered Abigail to strictly comply with the visitation schedule, and continued to find her in contempt for violating joint custody requirements to

keep Kellen informed of extracurricular activities and changes in the children's education. Kellen was awarded attorney's fees and expenses.

¶7.    Just four months later, Abigail filed a new petition for contempt and again sought modification of visitation. She claimed that "since the entry of the last Order, there has been a material and substantial change in circumstances adversely affecting the minor children," and "the parties' current visitation schedule is no longer workable." Kellen filed a motion to dismiss. He argued Abigail's claims had just been raised and denied by the trial court, so they should be barred as res judicata.

¶8.    Both parents testified at a hearing on the petition. To Abigail, the PSA's lack of specificity as to what days qualified as a "holiday" was causing repeated breakdowns. The PSA stated that "a Monday holiday should be contained in a part of the weekend period of custody. And should that period be with the Father, his weekend visitation shall end Tuesday morning." While Kellen testified this was clear to him, Abigail's testimony centered on multiple instances of friction on this point.

¶9.    Another major focus of the hearing was whether the drop-off time the Monday after Kellen's weekend was too vague to be followed. Counsel for Abigail repeatedly questioned Kellen about whether he agreed that the PSA was vague. While Kellen largely focused on the plain text of the PSA in his answers, when asked if he agreed whether "the schedule is definitely missing some time and specifics," he conceded that "it does not include every instance of every exchange time."

¶10.   To Abigail, since the PSA didn't include times for a drop off, the parents repeatedly

disagreed over when Kellen was supposed to return the kids on a Monday morning. Abigail testified she thought Kellen used the vagueness of the PSA against her, stating, "morning can be whatever he wants it to be." She further explained that "the biggest thing is the agreement is not clear on everything."

¶11. After hearing from both parents and the arguments of their counsel, the chancellor ultimately found the visitation schedule should be modified. The trial court found the schedule was "no longer working, and it is not in the best interest of the minor children." The new order added clarification to the portions of the previous schedule Abigail claimed were unclear. The order made clear the visitation requirements for Christmas, Easter, Thanksgiving, and other school holidays such as Spring Break, including the specific times the visitation would both begin and end. Last, the trial court determined that Abigail, as the "primary physical custodial parent," would have the "final decision making authority" in the event of any disagreements.

¶12. In January 2022, Kellen filed a motion for reconsideration and a motion for relief that the chancellor denied. Kellen appealed, and the case was assigned to us for review.

## STANDARD OF REVIEW

¶13. Our standard of review in domestic-related cases is limited. *In re C.T.*, 228 So. 3d 311, 315 (¶6) (Miss. Ct. App. 2017). We will not disturb a court's findings "when supported by substantial evidence unless the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied." *Id.* (quoting *Bowen v. Bowen*, 107 So. 3d 166, 169 (¶6) (Miss. Ct. App. 2012)). However, we review a chancellor's

4

interpretation and application of the law de novo. *C.T.*, 228 So. 3d at 315 (¶6).

## DISCUSSION

**I.   The chancellor did not err in finding that the visitation schedule was no longer working and should be modified.**

¶14.   Kellen argues that the chancellor erred when he found the visitation schedule was no longer working and should be modified. Kellen asserts that the previous Order followed what the parties agreed to in the PSA, and that nothing had changed since the last order was entered in August of 2020.

¶15.   As this Court has explained, "to modify a visitation order, it must be shown that the prior decree for reasonable visitation is not working and that a modification is in the best interest of the child." *Moreland v. Spears*, 187 So. 3d 661, 666 (¶17) (Miss. Ct. App. 2016) (internal quotation marks omitted); *see also Cox v. Moulds*, 490 So. 2d 866, 869 (Miss. 1986) (holding "all that need be shown is that there is a prior decree providing for reasonable visitation rights which isn't working" and provisions should be "made specific rather than flexible and attendantly vague").

¶16.   We have affirmed in a similar case to this one when there was proof of a breakdown in the visitation schedule. *C.T.*, 228 So. 3d at 317 (¶16). On appeal the father "argue[d] that the chancellor's modification was an abuse of discretion because neither party requested the modification or presented evidence that the visitation schedule was not working." *Id.* But we found "the record is replete with evidence that the visitation schedule was not working," the father had claimed he was being denied visitation, and the trial court "noted that there was some confusion between the parties regarding the details of visitation under the agreed

order." *Id.* We found this was a sufficient basis to modify the visitation schedule "[g]iven the chancellor's broad discretion to determine the specific times for visitation[.]" *Id.* (internal quotation marks omitted).

¶17. The proof in this case surpasses what we affirmed in *C.T.* While Kellen argues that the visitation schedule should not be modified because nothing has changed since the PSA was approved by both sides, the proof at trial showed otherwise. Abigail testified the lack of specificity in the PSA was leading to breakdown after breakdown and friction between her and Kellen. Abigail further testified that the two parties disagreed even over what "morning" was, saying, "[M]orning can be whatever [Kellen] wants it to be." To her, "the biggest thing is the agreement is not clear on everything." Indeed, even Kellen agreed on cross that the schedule "does not include every instance of every exchange time."

¶18. Accordingly, we find that the chancellor did not abuse his discretion in modifying the visitation schedule. There was substantial evidence supporting the chancellor's finding the schedule was no longer working. And the order modifying visitation only had the effect of further defining Christmas, Easter, Thanksgiving, and other "holiday" times, and including more detail as to what times each parent would have the children during those time periods. Therefore, we find the chancellor did not err in modifying the visitation schedule because there was substantial evidence supporting that it was no longer working.

## II. Res judicata did not apply.

¶19. Kellen argues Abigail's petition for modification of visitation already had been previously addressed twice by the trial court, so it should have been barred by res judicata.

¶20. "The doctrine of res judicata bars parties from litigating claims within the scope of the judgment in a prior action. This includes claims that were made or should have been made in the prior suit." *Brown v. Brown*, 329 So. 3d 544, 561 (¶49) (Miss. Ct. App. 2021) (quoting *Hill v. Carroll County*, 17 So. 3d 1081, 1084 (¶8) (Miss. 2009)). We recognize "the familiar rule that a judgment for alimony, custody, or support may be modified only upon a showing of a post-judgment material change of circumstance," which "is a recognition of the force of res judicata in divorce actions." *Stewart v. Stewart*, 309 So. 3d 44, 81 (¶118) (Miss. Ct. App. 2020) (quoting *Bowe v. Bowe*, 557 So. 2d 793, 794 (Miss. 1990)).

¶21. While res judicata can apply to claims of this type, we have previously held that "no decree of alimony or child support is ever truly a final judgment, but always subject to modification based upon a material change of circumstances." *Austin v. Austin*, 981 So. 2d 1000, 1005 (¶16) (Miss. Ct. App. 2007). In other words, if a party can provide evidence of a subsequent and material change in circumstances, a prior order denying relief will not bar a successive petition. *Id.* at (¶17) (finding "that the doctrine of res judicata does not act as a bar to the April 3, 2006, modification" despite the father previously seeking modification in two prior attempts, "[a]s this change in circumstances occurred after the February 20, 2002, decree").

¶22. Abigail had previously petitioned the trial court for a change in the visitation schedule, and that relief had been denied. But in the hearing for her renewed petition, she raised new facts not previously addressed by the trial court's prior orders, including evidence of recent breakdowns regarding drop-off times and confusion over how to interpret "holidays" such

7

as Spring Break. As in *Austin*, we find that res judicata did not bar her renewed claim for a modification of the visitation schedule since it was based on a change in circumstances after the prior order.

### III. The chancellor did not err in awarding Abigail the final-decision making authority.

¶23. Kellen argues the parties share joint legal custody and therefore share decision-making rights, so there was no basis for the chancellor to award final decision-making authority to Abigail.

¶24. Parents who share "joint legal custody" necessarily "share the decision-making rights, the responsibilities, and the authority relating to the health, education and welfare of a child." Miss. Code Ann. § 93-5-24(5)(e) (Rev. 2021). "And *unless allocated, apportioned or decreed*, the parents or parties shall confer with one another in the exercise of decision-making rights, responsibilities and authority." *Id.* (emphasis added).

¶25. "Mississippi statutory law and jurisprudence recognize that the chancellor may indeed allocate decision-making and duties to each parent sharing joint legal custody." *C.T.*, 228 So. 3d at 316 (¶9) (quoting *Carpenter v. Lyles*, 120 So. 3d 1031, 1037 (¶22) (Miss. Ct. App. 2013)). Our caselaw favors the custodial parent having the discretion for decisions regarding the "child's upbringing, including his education and health and dental care." *Id.* (citing *Clements v. Young*, 481 So. 2d 263, 267 (Miss. 1985)).

¶26. This Court addressed a similar argument in *C.T.* In that case, the father argued the chancellor erred when he found the mother, as the custodial parent, was entitled to make decision regarding where the child would attend school even though the parties shared joint

8

legal custody. *Id*. at 315 (¶7). This Court explained that the chancellor allocated to the mother the "discretion to make a determination about where the child goes to school." *Id.* at 316 (¶8). "The chancellor was well within his discretion to allocate this decision making to one parent." *Id*. at (¶9). Therefore, this Court found the chancellor did not abuse his discretion, and the issue was without merit. *Id*. at (¶10).

¶27. Here, the chancellor acknowledged the parties have joint legal custody and must confer on certain issues. However, the chancellor allocated "final determining decision making authority" to Abigail "as the primary physical custodial parent, in the event of a disagreement." Per precedent, the chancellor was well within his discretion to allocate final decision-making authority to one parent.

### IV. The chancellor did not err in not awarding Kellen attorney's fees.

¶28. Kellen argues that the chancellor erred when he ruled that each party was required to pay his or her own attorney's fees. On appeal, he asks us to reverse this finding.

¶29. "The award of attorney's fees and court costs is a matter within the sound discretion of the trial court." *Weston v. Mounts*, 789 So. 2d 822, 827 (¶21) (Miss. Ct. App. 2001). If a party does not prevail on the claim, the party is "therefore not entitled to an award of attorney's fees." *Id.* (finding that the husband was not in contempt); *Miley v. Daniel*, 37 So. 3d 84, 87 (¶8) (Miss. Ct. App. 2009) (explaining "we are not prepared to reverse a chancellor's decision to award a portion of attorney's fees when the requesting party did not prevail with the underlying claim").

¶30. Because Kellen did not prevail in the court below, and we have affirmed the trial

court's ruling in all respects, he is not entitled to an award of attorney's fees.

## CONCLUSION

¶31.    For the reasons set out above, we affirm the trial court's order.

¶32.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**